UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

INSURANCE COMPANY OF NORTH
AMERICA, a subrogee,

                    Plaintiff,

-vs-                                              Case No.  5:04-cv-86-Oc-10GRJ

AMERICAN MARINE HOLDINGS, INC.,

                    Defendant.
_____

## O R D E R

This admiralty case centers around the sinking of a vessel in the Gulf of Mexico in

June 2002.  Plaintiff Insurance Company of North America ("ICNA") insured the vessel on

behalf of its owner, and has paid the owner's claim for the loss of the vessel and other

property.  Plaintiff, as subrogee, now seeks compensation for this claim from Defendant

American Marine Holdings, Inc.  ("AMH"), the manufacturer of the vessel, on the grounds

that AMH negligently designed and manufactured the vessel, thereby causing the vessel

to sink, and breached both its express limited warranty and implied warranty of

merchantability by refusing to compensate Plaintiff for the loss of the vessel and other

property.

Presently before the Court for consideration are Defendant AMH's Revised Motion

for Summary Judgment (Doc.  43), and Plaintiff ICNA's Amended Motion for Summary

Judgment (Doc.  44).  Both  parties have filed briefs in opposition to their respective

motions, (Docs. 45, 46) and they are ripe for review.  For the reasons set forth below, the Court finds that Plaintiff ICNA's Motion is due to be denied in its entirety, and Defendant AMH's Motion is due to be granted in part and denied in part.

**Undisputed Facts and Procedural History**

## I.    Factual Background

In December 2001, Todd Schneider purchased a used 1998 Pro-Line vessel, Model 3250 Express, from Salty Sam's Marina ("Salty Sam's") in Ft. Myers, Florida.[1]  Salty Sam's had acquired the boat as part of a trade-in transaction with the boat's prior owner.  Pro-Line Boats, Inc., ("Pro-Line"), a division of AMH and the manufacturer of this particular used vessel, had contracted with Salty Sam's to sell various models of Pro-Line's boats as Pro-Line's authorized retail dealer, including the vessel at issue in this case.  At all times relevant, the terms and conditions of Salty Sam's relationship with Pro-Line, and in turn, its parent AMH, were governed by a Dealership Agreement.[2]  Upon completion of his purchase from Salty Sam's, Mr. Schneider obtained an insurance policy from ICNA for the value of the used vessel and property he may carry on the vessel.[3]

---

[1]Affidavit of Todd Schneider ("Schneider Aff.") at ¶ 4, attached as Exhibit A to ICNA's Amended Motion for Summary Judgment; Complaint at ¶ 9; Bill of Sale dated December 1, 2001, attached as Exhibit E to AMH's Revised Motion for Summary Judgment.

[2]Dealership Agreements for Model Years 2000-2005 ("Dealership Agreement"), attached as Exhibit D to AMH's Revised Motion for Summary Judgment.  The terms of the Dealership Agreements, which were renewed every model year, are substantially similar.  For ease of reference, the Court will refer to the Model Year 2005 Agreement throughout this Order.

[3]Complaint at ¶ 10.

At the time he purchased the used vessel, Mr. Schneider was aware that it came with a ten-year limited warranty, which covered the hull of the boat. The limited warranty provides that

> for ten (10) years after the date of delivery to the original retail purchaser, each new fiberglass hull manufactured by Pro-Line shall be free from structural defects due to material or workmanship under normal non-commercial use.[4]

The limited warranty excludes, along other things, "hull or component failure caused by normal wear and tear, climatic conditions, misuse, neglect, lack of proper maintenance, accident, fire or other casualty damage, racing, overloading, negligence, modification, or commercial use."[5] The limited warranty also clearly states in large, capital letters, that the repair or replacement of defective parts is the sole and exclusive remedy under the warranty, and Pro-Line's sole and exclusive liability. In addition, the limited warranty states, again in all capital letters, that

> THIS WARRANTY, AND THE RIGHTS AND REMEDIES UNDER IT IS EXCLUSIVE AND IS GIVEN IN PLACE OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE, WHETHER ARISING BY LAW, CUSTOM, CONDUCT OR USAGE OF TRADE. PURCHASER'S REMEDIES SHALL BE LIMITED AS STATED HEREIN AND

---

[4]Pro-Line Boats Limited Warranty ("Limited Warranty"), attached as Exhibit B to ICNA's Revised Motion for Summary Judgment. The vessel also contained a one year warranty for all boat components manufactured by Pro-Line, Id., however this warranty expired prior to the date Mr. Schneider purchased the vessel and is not at issue in this case.

[5]Limited Warranty.

PRO-LINE SHALL NOT BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES OR LOSSES RESULTING FROM DEFECTS.

THIS LIMITED WARRANTY GIVES PURCHASER SPECIFIC LEGAL RIGHTS.  PURCHASER MAY HAVE OTHER RIGHTS WHICH MAY VARY FROM STATE TO STATE.  IN THE EVENT THAT IMPLIED WARRANTIES ARE FOUND TO EXIST UNDER THE LAW OF A PARTICULAR STATE NOTWITHSTANDING THE EXCLUSION CONTAINED HEREIN, THE DURATION OF ANY SUCH WARRANTY SHALL BE LIMITED TO THE DURATION OF THE APPLICABLE LIMITED WARRANTY STATED HEREIN.

THE SELLING DEALER IS NOT A WARRANTOR AND IS NOT AUTHORIZED BY PRO-LINE TO AMEND OR MODIFY THIS LIMITED WARRANTY IN ANY MANNER.[6]

The limited warranty contains a transferability provision for subsequent purchasers of the vessel.  Specifically, the limited warranty may be transferred to subsequent purchasers during the ten-year warranty period, "provided that such subsequent purchaser pays the required transfer fee to Pro-Line and registers his ownership with Pro-Line within thirty (30) days of such purchase."[7]  Registration involves completing a warranty registration card and submitting it to Pro-Line, along with the $50 transfer fee.[8]  There is no such registration requirement for new purchasers.[9]

_____

[6]Id.

[7]Id.

[8]Id.

[9]The limited warranty contains an acknowledgment provision for new purchasers which (continued...)

4

Finally, the limited warranty provides that:

> This limited warranty contains the entire agreement between Pro-Line and Purchaser and supersedes all prior agreements, discussions, negotiations, commitments and representations, whether oral or written, between them regarding Pro-Line's warranty.   If any provision of this limited warranty, or the application of it, is determined to be invalid or unenforceable for any reason, the remainder of this limited warranty and the application of it shall not be affected.[10]

Notably, Salty Sam's is not mentioned anywhere in the text of the limited warranty.

ICNA asserts that Salty Sam's used the limited warranty as a selling point to convince Mr.  Schneider to purchase the vessel, and that Salty Sam's implied that the limited warranty would become automatically effective upon purchase.[11]  AMH disputes this point and claims that Salty Sam never made any representations about the existence or terms of the limited warranty.  However, it is undisputed that Mr.  Schneider never paid the required transfer fee to Pro-Line and did not register with Pro-Line within 30 days of his purchase of the vessel.[12]

---

[9](...continued)
simply states that by signing an attached warranty registration card, the purchaser acknowledges that he or she has read the limited warranty and understands its terms and conditions.  Id.  Unlike the transfer provision for subsequent purchasers, there is no statement that completion of the warranty registration card by new purchasers is a condition precedent for the limited warranty to become effective.

[10]Id.

[11]Schneider Aff.  at ¶¶ 8-9.

[12]Schneider Aff.  at ¶¶ 9, 16; Affidavit of Jim Kogler, Jr.  at ¶¶ 7-8 ("Kogler Aff."), attached
(continued...)

On or about June 15, 2002, Mr. Schneider embarked in his vessel on a sport fishing and diving trip to the Gulf of Mexico.[13]  During this trip, the vessel's starboard deck to hull joint separated allowing water to enter and flood the vessel, causing the vessel to sink.[14] The vessel was approximately 23 miles offshore at the time of the sinking, and Mr. Schneider, along with his four trip companions, were forced to float in the Gulf of Mexico until the United State Coast Guard (along with another vessel) rescued them and towed the submerged vessel to shore.[15]  Although Mr. Schneider did not suffer any serious injuries other than severe sunburn, he did suffer the loss of several thousand dollars worth of fishing and diving equipment, as well as the total loss of his vessel.[16]

Mr. Schneider contacted Pro-Line shortly after the sinking to inquire about the limited warranty and obtaining another vessel.[17]  At that time, Pro-Line informed Mr. Schneider that he had never transferred the ten-year limited warranty into his name, and therefore Pro-Line was under no obligation to repair or replace the vessel.[18]  Neither Pro-

---

[12](...continued)
as Exhibit B to AMH's Revised Motion for Summary Judgment.

[13]Complaint at ¶ 11.

[14]Schneider Aff. at ¶ 10.

[15]Schneider Aff. at ¶ 10.

[16]Schneider Aff. at ¶¶ 10, 14-15.

[17]Schneider Aff. at ¶ 12.

[18]Schneider Aff. at ¶ 13.  ICNA asserts that representatives from Pro-Line told Mr. Schneider that they would transfer the limited warranty into his name, and "try to work with him" (continued...)

Line nor AMH have ever compensated Mr. Schneider for his losses, and they never replaced the sunken vessel. Instead, Mr. Schneider purchased a new vessel from Pro-Line. Mr. Schneider has been fully compensated by ICNA under his insurance policy both for the value of the vessel and the value of his fishing and diving equipment.[19]

## II.   Procedural History

ICNA, as subrogee of Mr. Schneider's claims, seeks compensation from AMH (as the parent of Pro-Line) for the amounts ICNA paid to Mr. Schneider for the value of the vessel and Mr. Schneider's lost equipment, plus salvage expenses. On March 5, 2004, ICNA initiated this action against AMH with the filing of a five count complaint. Counts I and II assert claims for breach of the express limited warranty covering the hull of Mr. Schneider's used vessel, and breach of AMH's implied warranty of merchantability. Count III is a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., ("MMWA") for breach of AMH's implied warranty of merchantability and further asserts that AMH has unlawfully attempted to limit the duration of its implied warranty of merchantability. Counts IV and V are state law claims for negligence and strict liability, centering on AMH's alleged improper design and manufacture of the vessel.

---

[18](...continued)
to see if the warranty would cover the destroyed vessel, however, the Pro-Line representative denies ever making any such statements. See Excerpts of Deposition of James Kogler at p. 52, attached as Exhibit F to AMH's Response in Opposition to ICNA's Revised Motion for Summary Judgment (Doc. 45).

[19]Complaint at ¶ 13.

Neither party disputes that the Court has admiralty jurisdiction, as well as federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1333, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  The parties further agree that Florida law applies to the breach of warranty claims.  Following completion of discovery, both parties have filed summary judgment motions seeking judgment in their favor on all claims.  The motions are now ripe for review and will be addressed below.

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party."  Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact.  If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove."  Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987).  The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

8

## Discussion

### I.   Warranty Claims

ICNA has asserted three breach of warranty claims against AMH for the sinking of Mr.  Schneider's vessel: a claim for breach of the express ten-year limited warranty covering the vessel's hull, and two claims for breach of AMH's implied warranty of merchantability - under both maritime law and the Magnuson-Moss Warranty Act. According to ICNA, it is clear from the terms of the express limited warranty, as well as federal law, that AMH's express and implied warranties covered the sinking of Mr. Schneider's vessel, and therefore AMH is liable for its replacement cost and the cost of any lost property.  AMH, however, asserts that because Mr.  Schneider never transferred the limited warranty into his name as required by the terms of the limited warranty itself, and because Mr. Schneider did not purchase the vessel directly from AMH, that there is no privity of contract between Mr.  Schneider and AMH, or in turn, between AMH and ICNA as subrogee, and therefore there are no valid warranties to enforce.[20]

### A.   Registration of Warranty Transfer as Condition Precedent

---

[20]   Under Florida law, which is instructive in admiralty claims, ICNA must prove privity of contract between itself and AMH in order to recover under a theory of either breach of express warranty or breach of implied warranty against AMH. See Kramer v. Piper Aircraft Corp., 520 So.2d 37 (Fla. 1988); Mesa v.  BMW of North America, LLC, 904 So.2d 450, 458 (Fla.  3d DCA 2005); Weiss v.  Johansen, 898 So.2d 1009, 1012; Affiliates for Evaluation and Therapy, Inc. v. Viasyn, 500 So.2d 688 (Fla. 3d DCA 1987); GAF Corp v. Zack Co., 445 So.2d 350 (Fla. 3d DCA 1984); Baker v. Danek Medical, 35 F.Supp.2d 875 (N.D. Fla. 1998).

ICNA does not dispute Mr. Schneider's failure to properly transfer the limited warranty into his name, nor does ICNA dispute the fact that Mr. Schneider bought the used vessel directly from Salty Sam's.  Instead, ICNA contends that the requirement as set forth in the express limited warranty that a subsequent purchaser must register ownership with Pro-Line and pay a warranty transfer fee within 30 days of purchase is an unlawful condition precedent, which does not negate the validity of the limited warranty.  In effect, ICNA asserts that the warranty automatically transferred to Mr.  Schneider upon his purchase of the vessel - contrary to the plain and express terms of the limited warranty itself.

ICNA has provided no authority for this proposition and the Court has also been unable to find any support for this argument.  Rather, ICNA attempts to establish that AMH did not as a practice strictly enforce its warranty transfer registration requirement, and therefore it should not be enforced here.  In support, ICNA points to two instances that are readily distinguishable from the case at hand: (1) the fact that AMH provided warranty repairs to the original owner of the vessel where the original owner completed his warranty registration card, but did not sign it; and (2) the fact that AMH did not require its own dealer - Salty Sam's - to submit a warranty transfer registration card at the time it acquired the used vessel as part of a trade-in transaction.

The first instance is clearly of no import in this case - there is no language whatsoever in the limited warranty requiring purchasers of <u>new vessels</u> to submit a warranty registration card as a condition precedent to the validity of the warranty itself.

10

Moreover, it is clear that the original owner of the vessel did in fact submit such a registration card, he merely forgot to sign it (and again, there is no requirement that new owners must sign such a registration card to validate the warranty).  In contrast, Mr. Schneider did not submit a warranty transfer registration card at all - in direct contravention of the express terms of the limited warranty.

Similarly, ICNA's reliance on the fact that Salty Sam's did not submit a warranty transfer registration card when it obtained the used vessel is without merit.  Salty Sam's obtained the used vessel as a trade-in, as permitted by the terms of its Dealership Agreement with AMH.  This was obviously not a subsequent consumer or third-party purchase.  As part of the Dealership Agreement, Salty Sam's is responsible for performing repairs on AMH vessels and for ensuring that any vessels sold - whether new or used - "will operate properly in the hands of the buyer."[21]   There is nothing in the Dealership Agreement which would require Salty Sam's to register a warranty with AMH before it could fulfill its obligations as set forth in the agreement.  To add such a requirement, as ICNA seems to imply, simply makes no sense.[22]

ICNA's reliance on the Federal Trade Commission's ("FTC") interpretations of the MMWA is equally misplaced.  Those interpretations prohibit the condition precedent of a warranty registration card for full warranties.  See 16 C.F.R. § 700.7 ("a requirement that

---

[21]Dealership Agreement at ¶ 3.3(g).

[22]See also Deposition Testimony of James Kogler at pps.  82-83, attached as Exhibit B to ICNA's Response in Opposition to AMH's Revised Motion for Summary Judgment (Doc.  46).

the consumer return a warranty registration card or a similar notice as a condition of performance under a full warranty is an unreasonable duty") (emphasis added); see also 15 U.S.C. § 2303 (defining "full" and "limited" warranties) and 15 U.S.C. § 2304 (prohibiting condition precedents for full warranties).   There is no such prohibition on warranty registration cards for limited warranties.  Indeed, in another interpretation of the Act, the FTC provides for such registration cards.  See 16 C.F.R. § 701.4 ("when a warrantor employs any card such as . . .  a warranty registration card, . . . and the return of such card is a condition precedent to warranty coverage and performance, the warrantor shall disclose this fact in the warranty.").   Thus, ICNA cannot demonstrate that AMH's registration requirement for the transfer of its limited warranty to subsequent purchasers of used Pro-Line vessels is either unlawful or unenforceable.[23]

## B.  Salty Sam's Marina As AMH's Agent

ICNA next attempts to evade AMH's warranty transfer registration provision by asserting that Salty Sam's was acting as AMH's agent at the time it sold the used vessel to Mr.  Schneider, and, in particular, when Salty Sam's allegedly represented to Mr.

---

[23]ICNA further argues that because Pro-Line allegedly engaged in negotiations with Mr. Schneider following the sinking of his vessel in an attempt to enforce the limited warranty, AMH in effect waived the warranty transfer requirements.  In support, ICNA submits the affidavit of Mr. Schneider, which states that Pro-Line informed Mr.  Schneider that the warranty was never transferred into his name, but that Pro-Line would transfer the warranty over in the computer and "see what they can do."  Schneider Aff.  ¶ 13.  Aside from the fact that AMH denies that anyone at Pro-Line ever made any such statements, and has submitted deposition testimony to that effect, see Kogler Dep., p.  52, lns.  12-15, attached as Ex.  F to AMH's Response in Opposition, the Court does not believe that such a statement is sufficiently precise to constitute a waiver of the warranty transfer requirement.

Schneider both that the ten year limited warranty applied to his vessel as of the date of purchase and that it would take care of completing the warranty transfer registration. According to ICNA, by acting as AMH's agent in this instance, Salty Sam's created the necessary privity of contract between AMH and Mr.  Schneider with respect to the limited warranty and any applicable implied warranties.   Although AMH vigorously disputes that any such statements were ever made to Mr.  Schneider, even if such statements were made, AMH argues that Salty Sam's was not acting as its agent at the time of the sale to Mr.  Schneider and was not authorized to make such statements to Mr.  Schneider.

In order to establish an agency relationship under Florida law, ICNA must prove that (1) the principal acknowledges that the agent will act for it; (2) the agent accepts the undertaking; and (3) the principal controls the actions of the agent.  Whitestone Candy Co., Inc.  v.  Kraft Foods, Inc., 351 F.3d 1067, 1077 (11th Cir.  2003); Nida Corp.  v.  Nida, 118 F.Supp.2d 1223, 1227 (M.D. Fla.  2000); Goldschmidt v.  Holman, 571 So.2d 422, 424 n. 5 (Fla.  1990); Font v.  Stanley Steemer Int'l., Inc., 849 So.2d 1214, 1216 (Fla.  5th DCA 2003).   The existence of an agency relationship may be established expressly by written contract or other documentation, by apparent authority, or by ratification.  Chase Manhattan Mortgage Corp.  v.  Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A., 694 So.2d 827, 832 (Fla.  4th DCA 1997).   The party seeking to establish the existence of an agency relationship - in this case ICNA - bears the burden of proof.   Pinon v.  International Harvester Co., 390 So.2d 154 (Fla.  3d DCA 1980).

There is no agency relationship here because there was no acknowledgment by AMH that Salty Sam's would act on behalf of AMH with respect to the sale transaction, and in particular the transfer of AMH's limited warranty.  There is no evidence that AMH permitted Salty Sam's to modify its limited warranty on any prior occasion, or that Salty Sam's had the authority to do so in any situation.  To the contrary, as discussed below, it is clear that AMH - through its subsidiary Pro-Line - expressly prohibited Salty Sam's from acting as its agent in any capacity, and in particular, with respect to any modifications of AMH's limited warranty.

Moreover, there is no proof that AMH controlled Salty Sam's daily business operations.  The key to establishing an agency relationship is whether the principal exerts control over the agent.  Chase Manhattan Mortgage Co., 694 So.2d at 832; Parker v. Domino's Pizza, Inc., 629 So.  2d 1026 (Fla.  4th DCA 1993); see also Nida, 118 F. Supp.2d at 1227.  Under Florida law, control is defined as follows:

> Where the employee is merely subject to the control or direction of the employer as to the result to be procured, he is an independent contractor; if the employee is subject to the control over the employer as to the means to be used, then he is not an independent contractor.

Ortega v.  General Motors Corp., 392 So.2d 40, 42 (Fla.  4th DCA 1980).  See also Dorse v.  Armstrong World Industries, Inc., 513 So.2d 1265, n.  4 (Fla.  1987) (in a true agency relationship, the principal must control the means used to achieve the outcome, and not just the outcome itself).

14

In an attempt to establish the requisite level of control, ICNA first points to the Dealership Agreement between AMH's subsidiary Pro-Line and Salty Sam's as proof that AMH exercised sufficient control over Salty Sam's.  In particular, ICNA argues that the Dealership Agreement shows that Salty Sam's must: (1) obtain AMH's approval of the location and design of the dealership premises; (2) advertise and promote Pro-Line vessels in a manner satisfactory to AMH and substantially comply with AMH's recommendations as to displays; (3) make its records available for inspection by AMH and provide copies of all financial statements within 45 days of year-end; (4) meet standards set by AMH as to sales and customer service; (5) maintain a parts and services department; (6) provide service for Pro-Line vessels - including warranty service paid for by AMH - regardless of where they are purchased; and (7) obtain service training for members of its service department; and (8) conduct its business - including sales and service - in a manner consistent with AMH's reputation and customer satisfaction.[24]

While these provisions of the Dealership Agreement do confer on AMH a certain degree of control over aspects of Salty Sam's operations, this is not the end of the analysis. Rather, "the question of control for agency purposes must be determined by examining all of the rights and duties of the parties under the agreement."  Ortega v.  General Motors Corp., 392 So.2d 40, 42 (Fla.  Dist.  Ct.  App.  1981).  And, the most important "are those

---

[24]See Dealership Agreement at ¶¶ 3.1, 3.2, 3.3, 3.4

rights and duties of the parties which bear most directly and significantly on the right to control the day-to-day operation" of Salty Sam's business.  Id.

A review of the Dealership Agreement, and the record evidence demonstrates that AMH does not control the day-to-day operations of Salty Sam's.  For example, AMH does not regulate the hiring, firing or supervising of Salty Sam's employees.[25]  Rather, Salty Sam's exclusively determines these matters, as well as the wages and other employee benefits provided to its employees.  When Salty Sam's purchases vessels or parts and accessories from AMH, it becomes the owner of these items and resells them in accordance with its own terms and conditions - AMH has no control over how Salty Sam's conducts its sales transactions.[26]  Indeed, Salty Sam's responsibilities for its own operations is set forth in the Dealership Agreement itself:

> Responsibility for Management (a).  It is the responsibility of Dealer to provide personal services by exercising full managerial authority for Dealer's conduct of the operations contemplated by this Agreement (herein called Dealership Operations). Dealership Operations include the sale and service of Products and any other activities undertaken by Dealer related to Products, including new or used sales, service, finance and insurance operations whether conducted directly or indirectly by Dealer.  (b).  Dealer shall conduct all of its business, including, but not limited to, sales, service and warranty service in a manner which is consistent with the positive public relations, reputation, integrity and customer satisfaction of Company and

---

[25]See Dealership Agreement at ¶ 3.1.

[26]See Excerpts of Deposition of Daryl Hanson, pps.  43-44, and Excerpts of Deposition of Michael Keastner, pps.  63-64, both attached to AMH's Revised Motion for Summary Judgment.  See also Dealership Agreement at ¶ 3.1.

its Products in the sole discretion of the Company.  Dealer shall
pay all of its own expenses. . . .[27]

In another provision the Dealership Agreement itself clearly refutes the existence of

an agency relationship:

> NO AGENCY CREATED.  Nothing herein shall be deemed to
> authorize or empower Dealer to act as the agent or legal
> representative of the company for any purpose whatsoever.
> Dealer shall have not authority to make any decision as to any
> warranty claim with respect to any Company product.  Dealer
> shall indemnify Company against damage, loss or expense of
> whatever nature sustained by it by reason of the acts of Dealer
> or its agents or employees.[28]

Moreover, there is no evidence that AMH, either directly or through Pro-Line, owns any

portion of Salty Sam's.  Rather, Salty Sam's is independently owned, an important factor

towards establishing independent control.  Ortega, 392 So.2d at 42-43.

Finally, the limited warranty itself clearly states that the selling dealer - in this case

Salty Sam's  - is not the warrantor and is not authorized to amend or modify the limited

warranty in any manner.[29]  Obviously this would include waiving the warranty transfer

registration requirement.

A consideration of all of the provisions of the Dealership Agreement between AMH

and Salty Sam's compels the conclusion that, as a matter of law, the method or mode of

operation of Salty Sam's business on a daily basis is controlled by Salty Sam's as an

---

[27]Dealership Agreement at ¶ 3.1.

[28]Dealership Agreement at ¶ 13.

[29]See Limited Warranty.

independent contractor, not by AMH.  Salty Sam's is therefore not an agent of AMH.  See

Ortega, 392 So.2d at 43.

Even when the Court looks beyond the terms of the Dealership Agreement to the

actions of Salty Sam's and AMH, the record evidence clearly shows that Salty Sam's was

not acting as AMH's agent with respect to the sale of the vessel to Mr.  Schneider, and, in

particular, with respect to any alleged representations Salty Sam's may have made

concerning the enforceability of AMH's limited hull warranty.[30]  For example, AMH never

gave Salty Sam's the authority to enter into contracts on behalf of AMH.[31]  In addition, AMH

had no control over the manner in which Salty Sam's Marina sold Pro-Line vessels - Salty

Sam's did not need to obtain authorization from AMH prior to completing a sale.[32]  There

is also a complete absence of proof demonstrating that Salty Sam's was authorized by

AMH to represent to any prospective subsequent purchasers the terms and conditions of

---

[30]In determining the level and extent of control the principal has over the putative agent, the Court must also look beyond the terms of the Dealership Agreement and consider the actual relationship and interactions between the parties.  See Font v.  Stanley Steemer Int'l., Inc., 849 So.2d 1214, 1216 (Fla.  5th DCA 2003); Parker v.  Domino's Pizza, Inc., 629 So.2d 1026, 1027 (Fla.  4th DCA 1993).

[31]See Excerpts of Deposition of Daryl Hanson, pps.  43-44, and Excerpts of Deposition of Michael Keastner, pps.  63-64, both attached to AMH's Revised Motion for Summary Judgment.  See also Dealership Agreement at ¶ 3.1.

[32]See Excerpts of Deposition of Daryl Hanson, pps.  43-44, and Excerpts of Deposition of Michael Keastner, pps.  63-64, both attached to AMH's Revised Motion for Summary Judgment.  See also Dealership Agreement at ¶ 3.1.

the limited warranty.[33]  To the contrary, all evidence points to the fact that Salty Sam's did

not have any such authority.

The fact that Salty Sam's performed warranty repair work on Pro-Line vessels also

does not demonstrate the existence of an agency relationship.  In accordance with the

terms of the Dealership Agreement, AMH paid Salty Sam's for all warranty work they

performed on Pro-Line vessels.  Salty Sam's was not acting on behalf of AMH when it

made such repairs, rather, it was acting as an independent contractor who was

compensated in accordance with the terms of its contract.

Similarly, the fact that AMH at times provided funds to ICNA for advertising

promotions and financing promotions does not create the sufficient nexus of control to

establish Salty Sam's as AMH's agent.  The times where AMH provided such funds were

few and far between and were provided as sales incentives, not part of the regular, daily

course of business.[34]  AMH did not dictate how Salty Sam's conducted its business

operations.

---

[33]ICNA makes much of the fact that Salty Sam's admits that it was responsible for registering the limited warranties for new boat purchasers.  See Excerpts of Deposition of Matthew Hansen, attached as Exhibit F to ICNA's Amended Motion for Summary Judgment, and Dealership Agreement at ¶ 3.4.  However, it is undisputed that Mr. Schneider was not a new purchaser, and there is no registration requirement in the limited warranty for new purchasers - only subsequent purchasers who wish to have the limited warranty transferred to them.  Tellingly, there is no requirement in the limited warranty that AMH's dealers complete the warranty transfer for subsequent purchasers - rather that obligation rests solely with the subsequent purchaser.

[34]See Excerpts of Deposition of Howard Papke, attached as Exhibit H to ICNA's Amended Motion for Summary Judgment; and Excerpts of Deposition of Darrell Hanson, attached as Exhibit I to ICNA's Amended Motion for Summary Judgment.

While it is not clear whether ICNA is arguing that Salty Sam's was the apparent agent of AMH, such an argument would also fail.  Under Florida law, a principal's actions may give rise to apparent authority and agency.  Overseas Private Investment Corp.  v. Metropolitan Dade County, 47 F.3d 1111, 1114 (11th Cir.  1995).  In order to establish an apparent agency relationship in this case, ICNA would have to prove that: (1) the principal (AMH) allowed or caused others to believe that a putative agent (Salty Sam's) has the authority to conduct the act in question; and (2) a third party (Mr.  Schneider) is aware of and relied on this authority to his detriment.  See Overseas Private Investment Corp., 41 F.3d at 1114; Borg-Warner Leasing v.  Doyle Elec.  Co., Inc., 733 F.2d 833, 836 (11th Cir. 1984).  Apparent agency can also arise "even in the face of the principal's silence when the principal by its actions creates a reasonable appearance of authority."  Borg-Warner Leasing, 733 F.2d at 836.  However, it cannot arise "from the subjective understanding of the person dealing with the purported agent."  Whitestone Candy, 351 F.3d at 1078 (quoting Ja Dan, Inc.  v.  L-J Inc., 898 F.Supp. 894, 900 (S.D. Fla.  1995)).

ICNA cannot establish the first prong.  There is absolutely no evidence that AMH ever represented to Mr.  Schneider or any other person that Salty Sam's was AMH's agent or had authority to act on behalf of AMH - for any purpose - or that AMH kept deliberately silent in the face of Salty Sam's actions.  Rather, it has been shown that AMH was completely in the dark as to any alleged statements Salty Sam's may or may not have made regarding the warranty transfer for Mr.  Schneider.  The first time AMH ever learned that Mr.  Schneider was even the owner of the vessel was when Mr.  Schneider contacted

20

AMH and asked for a replacement for his sunk vessel.[35]  Given AMH's lack of knowledge concerning the sale to Mr.  Schneider, or of what Salty Sam's may or may not have told Mr. Schneider, it is entirely reasonable and expected that it would stay silent in the face of any statements by Salty Sam's.  Thus, it was merely the subjective understanding of Mr. Schneider that Salty Sam's was the agent of AMH and had the authority to transfer the warranty on Mr.  Schneider's behalf.[36]  Such subjective understanding does not create apparent authority.

ICNA attempts to evade this fatal deficiency by referring to the limited warranty itself as proof of the existence of an agency relationship between AMH and Salty Sam's Marina. According to ICNA, because the limited warranty extends to components installed by one of AMH's selling dealers, and because the warranty registration card has a signature line for the authorized dealer, it is clear that Salty Sam's was an agent of AMH, as well as a party to the limited warranty, thereby creating the necessary privity of contract between ICNA and AMH.  This argument simply makes no sense.  The limited warranty does not demonstrate any acceptance of authority on behalf of Salty Sam's with respect to the transfer of the warranty, it does not indicate that Salty Sam's is authorized to act on behalf of AMH in any manner, and it does not obligate Salty Sam's to do anything other than

---

[35]See Affidavit of Jim Kogler, Jr.  at ¶ 6; Excerpts of Deposition of James Kogler, p. 45, attached to AMH's Revised Motion for Summary Judgment.

[36]Moreover, there is no testimony that Mr.  Schneider ever thought Salty Sam's was acting as AMH's or Pro-Line's agent.  See Schneider Aff.

repair Pro-Line vessels which are already covered by the limited warranty.  See, e.g., 15 U.S.C. § 2307 (stating that where a warrantor designates a representative to perform warranty services, the representative does not become a co-warrantor).  Indeed, Salty Sam's is not even mentioned in the limited warranty at all.  To the contrary, the limited warranty clearly states that any authorized dealer is not a warrantor and does not have authority to modify the warranty.[37]

In sum, it is not necessary for the Court to determine whether Salty Sam's in fact did represent to Mr. Schneider that it would take care of transferring the warranty to his name, for even if Salty Sam's had made such representations, it did not do so as an agent of AMH.  While Salty Sam's statements, if true, may have created a cause of action against Salty Sam's, they cannot create privity of contract between Mr. Schneider and AMH such that ICNA can enforce the terms of the limited warranty against AMH.  Similarly, this lack

---

[37] See Limited Warranty.  ICNA's reliance on Bland v. Freightliner LLC, 206 F. Supp.2d 1202 (M.D. Fla. 2002) is misplaced.  In that case, the relationship between the manufacturer and dealer was much closer - the dealer was named several times throughout the text of the warranty and was used almost interchangeably with the manufacturer.  The Plaintiffs essentially alleged that the manufacturer would cease to exist without the dealer.  Bland, 206 F. Supp.2d at 1207.  That is hardly the case before this Court.  There is absolutely no proof that AMH and Salty Sam's are one and the same - i.e., without Salty Sam's AMH would go out of business.  Salty Sam's is not mentioned at all in the limited warranty - to the contrary, the limited warranty clearly states that any retail dealer is not a warrantor and is not authorized to modify the warranty in any manner.  Moreover, Bland was at the motion to dismiss stage, where all allegations as set forth in the complaint must be taken as true and in the light most favorable to the Plaintiff.  Id. at 1205.  The Court in Bland did not have the benefit of extensive discovery as in this case, and did not hold, as a matter of law, that the dealer was, in fact, the agent of the manufacturer, but rather that the Plaintiff had, at an early stage in the litigation, pleaded sufficient allegations to survive a motion to dismiss.

22

of privity renders any implied warranty of merchantability unenforceable as well.[38]

Accordingly, AMH is entitled to summary judgment on ICNA's warranty claims and ICNA's

motion for summary judgment on the warranty claims is due to be denied.

## II.    Negligence and Strict Liability Claims

In addition to seeking contractual remedies, ICNA has also sought recovery under

the tort theories of negligence and strict liability.  Both claims clearly exist under the Court's

admiralty jurisdiction.  East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858,

865, 106 S.Ct.  2295, 2299 (1986) ("We join the Courts of Appeals in recognizing products

liability, including strict liability, as part of the general maritime law.").  AMH argues that

ICNA cannot proceed with either of its tort claims because they are precluded by the

economic loss rule.  As defined by the United States Supreme Court in  East River, the

economic loss rule holds that "a manufacturer in a commercial relationship has no duty

---

[38]See, e.g., Baker v. Danek Medical, 35 F.  Supp.  2d 875 (N.D. Fla.  1998); Kramer v. Piper Aircraft Corp., 520 So.2d 37 (Fla.  1988).  For this same reason, ICNA's claim under the MMWA also fails.  The MMWA allows any consumer who is damaged by the failure of a warrantor to comply with its obligation under a written or implied warranty to file a suit for damages in federal court.  15 U.S.C. § 2310(d)(1).  The Act further defines an "implied warranty" as an implied warranty under state law.  15 U.S.C. § 2301(7).  Because ICNA has failed to establish the existence of an implied warranty between itself and AMH under Florida law due to a lack of privity, there can be no implied warranty under federal law, and AMH is entitled to summary judgment on this claim as well.

ICNA's MMWA claim also fails on the merits.  According to ICNA, AMH violated 15 U.S.C. § 2308(b) by failing to "set forth in clear and unmistakable language . . . prominently displayed on the face of the warranty" the duration of any  implied warranties that might apply to Mr. Schneider's used vessel.   A quick perusal of the limited warranty itself belies that claim.  See Limited Warranty (stating that the duration of any implied warranties shall be limited to the duration of the applicable limited warranty stated herein, and stating that the limited hull warranty is for ten years).  For this reason as well, AMH is entitled to summary judgment on ICNA's MMWA claim.

under either a negligence or strict products-liability theory to prevent a product from injuring itself." 476 U.S. at 871.  In other words, an admiralty tort plaintiff cannot recover for any damage to the defective product itself, but the plaintiff can recover for damage the product causes to other property or for any personal injuries.  Saratoga Fishing Co.  v.  J.M. Martinac & Co., 520 U.S. 875, 877, 117 S.Ct.  1783, 1785 (1997).  According to the Supreme Court, the economic rule exists because "[c]ontract law, and the law of warranty in particular, is well suited" to controversies involving a defective product, because "warranty law sufficiently protects the purchaser by allowing it to obtain the benefit of its bargain."  East River, 476 U.S. at 872-73.  Thus, in the present case, AMH argues that because ICNA has sought purely economic damages - *i.e.* the loss of the used vessel and Mr.  Schneider's fishing and diving equipment - and because ICNA has sought relief under various warranty theories, ICNA cannot also seek tort relief for the same damages.

AMH is wrong.  The economic loss rule cannot apply in this case because there is no contractual remedy available.  As discussed above, ICNA and AMH are not in privity with each other such that a valid and enforceable express or implied warranty exists. Because ICNA cannot pursue any breach of express and/or implied warranty claims against AMH, the economic loss rule does not apply.  See Tai-Pan, Inc.  v.  Keith Marine, Inc., Case No.  95-338-CIV-J-20, 1997 WL 714898 at * 7 (M.D. Fla.  1997) ("the economic loss rule bars claims in tort for purely economic losses when there are contractual or statutory remedies available.")

In addition, ICNA does not seek recovery solely for the value of the used vessel. ICNA also seeks recovery for the value of Mr. Schneider's property that was lost and for which ICNA reimbursed Mr. Schneider.[39]  Under federal admiralty law, where a plaintiff seeks recovery for an economic loss, along with an accompanying physical injury or other property damage, the economic loss rule does not bar recovery in tort for the damages attributable to the other property and/or personal injury.  Saratoga Fishing CO. v. J.M. Martinac & Co., 520 U.S. 875, 878-82, 117 S.Ct. 1783 (1997); East River, 476 U.S. at 871-75; Marshall v. Wellcraft Marine, Inc., 103 F.Supp.2d 1099, 1108-09 (S.D. Ind. 1999). The Court is further persuaded by Judge Hoeveler's well-reasoned opinion in Farley v. Magnum Marine Corp., N.V., Case No. 89-0725-CV, 1995 WL 795711 (S.D. Fla. June 9, 1995), which limited the economic loss rule as set forth in East River to solely "commercial" transactions where there was no damage to other property.  In Farley, Judge Hoeveler found that the economic loss rule did not apply to consumer transactions because "the customer is not in a position to negotiate for warranties or other contractual protection, especially if he or she is a downstream buyer." Farley, 1995 WL 795711 at * 2. See also Saratoga Fishing Co., 520 U.S. at 878 (noting that the economic loss rule applies where "[t]he context is purely commercial."); East River, 476 U.S. at 877.  Because in this case,

---

[39]For the first time and in response to AMH's motion for summary judgment, ICNA now claims that it is also seeking reimbursement for Mr. Schneider's personal injuries. While the Court questions whether ICNA can recover for any such damages - particularly since it has not included this aspect of damages in its initial disclosures or apparently in any other discovery materials - the Court will allow ICNA's tort claims to go forward at this time.

Mr. Schneider purchased the used vessel as part of a consumer transaction, and because ICNA is seeking recovery for property (and potentially personal injuries) other than the value of the vessel itself, as well as the lack of any viable contractual remedies, ICNA may proceed with its tort claims.[40]

At this time, the Court is unable to dispose of these tort claims on their merits. There is conflicting evidence - including conflicting expert testimony - both as to the cause of the vessel's sinking, and as to whether the vessel was in fact defective. According to ICNA's expert, AMH used inadequately sized fasteners - also known as pinning screws - to attach the hull to the deck, and AMH spaced the screws too far apart.[41]  AMH, however, claims that an entirely different reason caused the vessel to sink - namely Mr. Schneider's inappropriate use of the vessel. AMH has submitted testimony from a surveyor and the owner of Pro-Line boats - both of whom inspected the vessel in detail - which support AMH's claim that Mr. Schneider rammed the vessel at least once into a dock piling, and that the strong impact resulted in the eventual separation of the hull from the deck.[42]  This

---

[40]  See also Employers Ins.of Wassau v. Suwannee River Spa Lines, 866 F.2d 752, 760 (5th Cir. 1989) ("[A] maritime tort claim . . . should not be dismissed . . . where the requirements for admiralty jurisidiction are otherwise met if the facts of the case support a theory of recovery not clearly barred by East River or other controlling authority.").  In this case, East River does not clearly bar the claims alleged by ICNA, and therefore they will be allowed to go forward.

[41]See Excerpts of Deposition of L. Frank Hamlin, CMS, attached as Exhibit C to ICNA's Amended Motion for Summary Judgment.

[42]See Excerpts of Deposition of Randolph Wagner, attached as Exhibit C to AMH's Response in Opposition to ICNA's Amended Motion for Summary Judgment (Doc. 45); Excerpts of Deposition of John Walker, attached as Exhibit D to AMH's Response in Opposition to ICNA's
(continued...)

conflicting testimony clearly establishes a genuine issue of material fact thereby precluding summary judgment in favor of either party at this time.

### CONCLUSION

Accordingly, upon due consideration, it is ORDERED and ADJUDGED:

1.      Plaintiff Insurance Company of North America's Amended Motion for Summary Judgment (Doc.  44) is DENIED;

2.      Defendant American Marine Holdings, Inc.'s Revised Motion for Summary Judgment (Doc.   43) is GRANTED with respect to Counts I, II, and III of Plaintiff's Complaint (the warranty and Magnuson-Moss Warranty Act claims);

3.      Defendant American Marine Holdings, Inc.'s Revised Motion for Summary Judgment (Doc. 43) is DENIED with respect to Counts IV and V of Plaintiff's Complaint (the negligence and strict liability claims).

4.      The Clerk is directed to withhold the entry of judgment pending final resolution of the remaining claims in this case.

IT IS SO ORDERED.

---

[42](...continued)
Amended Motion for Summary Judgment; and Excerpts of Deposition of Robert Agle, attached as Exhibit E to AMH's Response in Opposition to ICNA's Amended Motion for Summary Judgment.

DONE and ORDERED at Ocala, Florida this 28th day of November, 2005.

UNITED STATES DISTRICT JUDGE

Copies to:    Counsel of Record