UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

INSURANCE COMPANY OF NORTH
AMERICA, a subrogee,

                  Plaintiff,

-vs-                                       Case No.  5:04-cv-86-Oc-10GRJ

AMERICAN MARINE HOLDINGS, INC.,

                  Defendant.

_____

## **MEMORANDUM OPINION**

This admiralty claim arises from the effective loss of a vessel manufactured by the Defendant, American Marine Holdings ("AMH"), a Delaware corporation.  The vessel was owned by Todd Schneider, an insured of the Plaintiff, Insurance Company of North America ("ICNA"), a Pennsylvania corporation.   ICNA has paid Schneider's claim for the loss of the vessel and other property Schneider housed on the vessel, and seeks compensation, as Schneider's subrogee, from AMH.

ICNA initiated this action against AMH on March 5, 2004, with the filing of a five-count complaint seeking relief on the grounds that AMH negligently manufactured the vessel, thereby causing it to sink, and breached both its express limited warranty and implied warranty of merchantability by refusing to compensate ICNA for the loss of the vessel and other property.  On November 28, 2005, the Court entered an Order (Doc. 55)

granting AMH's motion for summary judgment with respect to ICNA's breach of warranty claims.

This case is therefore down to two claims (of negligence and strict liability) as to whether the vessel in question was constructed with reasonable care in accordance with AMH's own design. There is no issue that the vessel's design was in any way defective. The claim is that the vessel was negligently constructed contrary to AMH's design, with particular emphasis on the spacing and size of the gunnel and pinning screws, and whether the size and spacing of these screws was sufficient to form a bond between the hull and the deck. There is also no dispute that there was in fact a separation of the hull and deck on the aft starboard side of the vessel, permitting an incursion of water that ultimately caused the vessel to founder.

A non-jury trial was held on these remaining claims on December 5-6, 2005, the Parties were provided the opportunity to submit proposed findings of fact and conclusions of law, and the matter is now ripe for resolution.

**FINDINGS OF FACT**

At the non-jury trial, the following was established by a preponderance of the testimony and documentary evidence offered and admitted into evidence.

I.    The Sale and Sinking of the Vessel

In 1997, AMH manufactured a 1998 Pro-Line vessel,[1] model 3250 Express, Hull Identification Number PCMA021D798.  AMH sold the vessel to one of its dealers, San Carlos Marine, in May 1997.  Roderick Kreuser purchased the vessel on June 2, 1997 from San Carlos Marine.  Kreuser had some service and parts work performed on the vessel in North Carolina, including removing and reinstalling one of the engines.  At some point, Kreuser sold the vessel to Rudy and Lois Betts of Wichita, Kansas.  On May 29, 2001, the Betts used the vessel as a trade-in on the purchase of a new vessel from Salty Sam's Marina in Fort Myers, Florida.  At the time the vessel was traded in, Michael Kaestner, the Sales Manager at Salty Sam's Marina, inspected the vessel, and found dock rash and scratching above and below the waterline on the hull.  However, the damage was not severe enough to prevent Salty Sam's from accepting the vessel as a trade-in and selling it to another purchaser.

Todd Schneider purchased the vessel from Salty Sam's Marina on December 1, 2001.  The total purchase price for the vessel was $118,000.  Schneider paid $101,000 in cash, and received a $17,000 trade-in allowance for his smaller fishing boat.  Prior to making the purchase, Schneider hired an accredited marine surveyor, Robert Agle, of Accurate Survey, to inspect the vessel and prepare a survey report.  Schneider relied on Agle's report  in deciding to purchase the vessel.

---

[1]Pro-Line Boats is a division of AMH and the manufacturer of the vessel at issue.

Agle inspected the entire vessel, including having it lifted out of the water so he could inspect the vessel's hull.  As part of his inspection, Agle used a plastic sound hammer on the hull to determine if there were any structural deficiencies within the vessel, such as separation of the fiberglass layers of the vessel's skin.  Agle found no indication of any structural weaknesses, although he was unable to assess certain interior areas of the vessel.  Agle also inspected the hull-to-deck joint, which is the area where the deck attaches to the hull, as well as the rub rail, or "gunnel," which covers the hull-to-deck joint and protects the joint from damage by contact with pilings, docks, or other structures or vessels.  He found no signs of any damage or separation of the rub rail system or the hull-to-deck joint; the system was intact and solid.

Agle also observed the screws and other fasteners used to attach the hull-to-deck joint in the engine compartment and the transom area.  The accepted industry standard is to place the screws every six inches apart, and Agle's report does not note any deviations from this standard.  However, Agle could not remember the exact distance between the screws and was not able to observe the entire hull-to-deck joint.  Finally, Agle inspected the bilge pumps on the vessel and discovered that the aft bilge pump and float switch for that pump were inoperable.  Agle included all of these findings in his survey report, and estimated the value of the vessel as $125,000.

Based on this survey report, Schneider prepared a "punch list" of repair items, which he provided to Salty Sam's Marina as a condition to purchase.  Repair of the aft bilge pump

4

was included on the repair list, and to the best of Schneider's recollection, those repairs were made.

Between December 1, 2001 and June 15, 2002, Schneider had taken the vessel out on cruising and/or fishing trips approximately six to ten times. Although Schneider did at times bump into dock pilings and other boats while docking, he never hit the vessel against any objects with any severe force, or ran the vessel into any dock pilings. Other than replacing the generator and a port side vent cover and adding an anchor to the front of the vessel, Schneider did not make any other modifications to the vessel.

On June 15, 2002, Schneider and four passengers embarked in his vessel on a sport fishing and diving trip to the Gulf of Mexico.  One of Schneider's passengers, George Hagadone, testified at trial that he inspected the vessel immediately before the trip and did not observe any hull to deck separation.[2]  Hagadone also did not see any evidence of prior impacts to the vessel, and testified that the vessel, particularly the engine, was in excellent condition.

Schneider's group left from Pete's Pier in Crystal River, Florida where the vessel was docked, with a destination of Crystal River Reefs located approximately 30 miles off shore. The weather was good, with a light chop of two-to-four feet.  About one hour into the trip, when the vessel was approximately 22-25 miles out to sea, the vessel became sluggish and began running slower than usual.  Hagadone lifted the motor hatch, and water came

_____

[2]Hagadone is an experienced boater, and holds a United States Coast Guard Captain's license.

spraying out of the hatch.  Schneider investigated and discovered water coming into the engine compartment from an approximately four-inch long, one inch-wide, separation between the hull and deck at the aft starboard corner of the vessel.[3]  The separation was above the normal water line, and the vessel took on water with every wave.  Schneider had never before experienced any similar flooding or leaking.

The vessel had three bilge pumps, and Schneider manually turned them all on after discovering the leak.   All three bilge pumps contained automatic float switch sensors, but Schneider testified that he did not know whether the bilge pumps had been operating automatically before he manually activated them.   Despite the operation of the bilge pumps, the vessel sank approximately 23 miles offshore and Schneider, along with his four passengers, were forced to float in the Gulf of Mexico for almost an hour before they were rescued by another boater.  At the time of the sinking, the vessel was in 28 feet of water, and the rear deck of the vessel, including the transom, was bouncing on the floor of the Gulf of Mexico.  Neither Schneider nor any of his passengers suffered any injuries aside from severe sunburn.

Sea Tow, a professional salvage company, later raised the vessel and towed her to port.   Sea Tow first unsuccessfully attempted to raise the vessel by ropes attached to the deck cleats, but the ropes kept breaking.  Sea Tow then used two of its boats to drag the vessel while it was still partially submerged from a depth of 28 feet to a depth of six to eight

---

[3]Hagadone also investigated and testified that the separation was more along the lines of twelve to eighteen inches in length.

feet of water, at which point Sea Tow was able to raise the vessel.  Dragging the vessel in this manner caused substantial damage, and allowed water to pour over the transom tearing up the back of the vessel.

The evidence presented at trial shows a substantial separation of the hull and deck on the starboard side in addition to the initial separation that caused the sinking.  The Court finds that the additional separation on the starboard side was the result of the salvage operations and has no bearing on the case in any way.

Schneider made a timely claim to ICNA for the loss of the vessel, salvage costs, and the loss of the value of his personal property housed on the vessel, including diving and fishing equipment.  Pursuant to the terms of the marine insurance policy, ICNA paid Schneider the agreed value of the vessel, $100,000, the personal property limit, $2,500, and Sea Tow's salvage claim of $7,250.  ICNA eventually sold the vessel at a salvage auction for $26,204.80, net of sale expenses.  The Parties have stipulated that the total amount of potentially recoverable damages is $83,542.20, plus attorneys' fees and costs allowed by law.

## II.   The Construction of the Vessel and the Hull-to-Deck Joint

Pro-Line utilized a "shoebox" design for the hull-to-deck joint on the vessel.  A "shoebox" design resembles the lid on a shoe box where the deck is bent downward at roughly a 90-degree angle, and slips over the top of the hull with an overlap.  The overlap is then secured with "pinning screws" set twelve to eighteen inches apart.  A "rub rail" made of PVC material is then wrapped around the overlapping area, and secured by rub rail or

7

"gunnel" screws.  The gunnel screws are placed in pre-drilled mounting holes located every six inches on the rub rail, with some additional screws used in areas where the rub rail bends, such as around the bow pulpit and transom.  Thus, when completely assembled, the hull-to-deck joint should be attached with either a pinning and/or gunnel screw set every six inches apart.

Pro-Line typically attaches the rub rail with number 10,[4] one and one-half inch or one and three-quarter inch self-tapping epoxy coated stainless steel screws that penetrate the entire hull-to-deck joint.  A stainless steel insert is then attached to the rub rail using number eight, one inch stainless steel screws.  The purpose of the stainless steel insert is solely cosmetic, it is not intended to assist in the joining of the hull to the deck, but simply covers the other screws for a more pleasing asthetic.

As previously mentioned, the design of the vessel is not in question, rather, the conflict in this case is whether the design was manufactured appropriately, and in particular whether the pinning and gunnel screws were properly spaced on the vessel and of sufficient length.   The Parties agree that the accepted industry standard for the spacing of pinning and gunnel screws or other fasteners used to attach the hull-to-deck joint is six inches.  However, the Parties presented conflicting testimony at trial regarding whether AMH complied with this standard, and whether AMH used the appropriate length screws.

III.   ICNA's Expert Testimony

---

[4]The number of the screw refers to the diameter of the screw.  A number 10 screw is slightly wider in diameter than a number 8 screw.

The first witness to testify on this issue was ICNA's expert, Lorne Hamlin.  Hamlin is a licensed marine surveyor, naval architect and licensed insurance adjuster.  He is a graduate of the Westlawn Institute of Marine Technology and has more than 35 years experience in the boat manufacturing industry.  Hamlin is also a member of the American Boat and Yacht Council, whose standards are typically followed by the recreational boating industry.

Hamlin inspected Schneider's vessel on three occasions, June 20, 2002 July 25, 2002, and December 2, 2005, reviewed records concerning the construction of the vessel and similar crafts, reviewed Agle's survey, reviewed the report of Randolph Wagner, one of AMH's expert witnesses, and interviewed Schneider concerning the vessel's history and the events leading up to its sinking.  From his inspections, Hamlin observed that the pinning screws on the aft starboard side of the vessel near where the separation occurred were spaced at least nine to ten inches apart from each other, and, at the point of separation, had broken loose from their threading in the hull.  On average, he found only two pinning screws for every 18-20 inches of the length of the hull-to-deck joint.  Based on these observations, Hamlin concluded that the pinning screws were spaced too far apart to be safe and secure, and were "completely inadequate."[5]

_____

[5]Hamlin testified at length about secondary or "back-up" methods of securing the hull-to-deck joint, such as resin or elastic bedding sealants, through-bolting or chemical sealants.  It is Hamlin's opinion that the most secure way to construct a hull-to-deck joint is with a combination of through-bolting with pinning screws six inches apart, and chemical bonding, and that AMH did not use this method when constructing Schneider's vessel.  However, Hamlin admitted that such
(continued...)

Hamlin also inspected the gunnel screws connecting the rub rail to the hull and deck, and was able to remove one from the rub rail at the point of the initial hull-to-deck separation.  Hamlin measured the gunnel screw and found it to be a number eight, one inch stainless steel screw, not the number ten by one and one-half inch or one and three-quarter inch screws AMH normally used.  Hamlin then measured the actual screws that were removed from the perimeter of the hull-to-deck joint, and ascertained that the pinning screws used in that area were number ten by one inch and one quarter screws (1 1/4"), one-half to one-quarter inch in length shorter than the screws AMH contends it typically uses on similar vessels.

Hamlin concluded that the gunnel screws were undersized in both diameter and length, and could not sufficiently penetrate and engage the hull to add security to the hull-to-deck joint.  Because they protruded only roughly an eighth of an inch past the inside of the deck and applied pressure to the hull, Hamlin determined that the gunnel screws were actually creating force to separate the hull-to-deck joint instead of working to secure it.[6] Hamlin supported his conclusions with several photographs of the separated hull-to-deck

---

[5](...continued)
methods (aside from the spacing of the pinning screws) are not commonly used on boats the size of Schneider's vessel, and that failure to use such methods is not a construction defect. Therefore, this testimony goes towards the design of the vessel, which is admittedly not at issue in this case.  The Court will thus not give any further consideration to this testimony, or to the testimony of AMH's experts refuting Hamlin's opinions on this topic.

[6]In addition, Hamlin opined that the size of the overlap was smaller than common practice in the industry and created a less secure joint.  Hamlin did not testify that this was the ultimate cause of the vessel's sinking.

10

joint.  These photographs show gunnel screws protruding only a short distance inside the deck portion of the joint, and instead of penetrating the hull, merely scratching its gel coating.[7]

In Hamlin's expert opinion, the insufficient length and spacing of the pinning and gunnel screws constituted unreasonable manufacturing defects, which existed at the time the vessel was constructed.  According to Hamlin, these three defects combined to create an insecure hull-to-deck joint that was "very prone to failure."  He believed that the defects in the size and spacing of the screws created an absolute certainty that the vessel's hull-to-deck joint would fail, and that this failure caused the vessel to sink on June 15, 2002.[8] Although Hamlin observed that the engines were missing two vent covers, and noted some localized areas on the exterior and gel coat of the vessel's fiberglass laminate that exhibited some stress cracking, (also known as "spider crazing"), he believed that this was minor damage from normal use of the vessel over time, and did not contribute to the vessel's sinking in any way.

---

[7]See Plaintiff's Composite Exhibit 50-B, photographs 18-19.  Hamlin also testified that the gunnel screws provided less holding power than a larger diameter screw would, but because the gunnel screws were of insufficient length to even fully  penetrate the hull, the diameter was of no effect.

[8]On cross-examination, Hamlin stated that he did not believe the salvage operations created any additional damage or separation to the hull-to-deck joint.  However, sufficient evidence was presented by other witnesses, including Schneider, establishing that the salvage operations created another, larger separation of the hull-to-deck joint.  The Court will therefore exclude any consideration of this larger separation as a potential cause of the vessel's sinking, and focus solely on the approximately four inch separation on the aft starboard side.

IV.    AMH's Expert Testimony

AMH presented several witnesses who testified that the vessel's hull-to-deck joint was properly constructed, using the appropriate size screws and spacing. These witnesses also testified as to the condition of the vessel and other factors that might have contributed to its sinking. AMH's first witness on this topic was Michael Kaestner, the sales manager of Salty Sam's Marina at the time the Betts traded-in the vessel, and when Schneider purchased the vessel. He is not a licensed surveyor, and was not submitted as an expert. Kaestner conducted a visual inspection of the vessel when the Betts traded it in, and found various scratches below the hull's water line, which Kaestner believed were from the vessel running into docks or pilings. However, Kaestner further testified that such scratches, or dock rash, are common and that he had no reports of any problems concerning the vessel from its prior owners. Kaestner also stated that he had "no qualms" with selling the vessel to Schneider.

AMH next presented the testimony of Randolph Wagner, a marine surveyor and general manager of Marine Surplus, a retail outlet that sells various boating parts and equipment. Prior to working for Marine Surplus, Wagner was the Vice President for Customer Service of AMH, where he conducted hundreds of boat inspections. Wagner specializes in surveys of recreational boats, and while he has only been a licensed surveyor for the past three years, he has over 30 years of surveying experience. Since obtaining his survey license, Wagner has conducted between 75 and 100 surveys. He is also a member of the American Boat and Yacht Council.

Prior to testifying at trial, Wagner reviewed Hamlin's expert reports and deposition transcript, Agle's survey report, and documents concerning the vessel's construction, repair, and sales history.  Wagner also inspected the vessel on or about February 3, 2003.[9] He climbed onto the boat and lifted the motor hatches in order to obtain a view of the pinning and gunnel screws, as well as the joint separation.  He "looked at the boat visually just from bow to stern, and that was about it."[10]   Wagner also spoke briefly with Hamlin, who was present during the inspection.

Wagner testified that he did not observe any defects in the construction of the vessel's hull-to-deck joint.  Instead, he believes that the screws Hamlin measured were not gunnel or pinning screws, but were actually the smaller screws used to attach the stainless steel insert on to the rub rail.  Wagner also challenged Hamlin's opinions on the spacing and size of the screws.  He testified that the screws used on the aft starboard side of the vessel's hull-to-deck joint were six to eight inches apart, of sufficient length to penetrate both the rub rail and the hull-to-deck joint, and were not broken.

Instead, Wagner pointed to a "tremendous amount of damage" he observed on the hull of the vessel, which he believed was caused by impacts of some sort.[11]   According to Wagner, these impacts compromised the hull-to-deck joint, causing it to flex and the

[9]Hamlin contends that this inspection took place in July 2002, but the exact date is not relevant to the key issues in this case.

[10]See Trial Transcript, dated December 5, 2005, at 152.

[11]Id. at 157.

13

screws to loosen, which ultimately resulted in a separation of the joint.  He based this opinion on the scratches and spider crazing on the sides and bottom of the vessel, as well as the fact that the stainless steel insert on the rub rail was bent.  Wagner testified that the only way the insert could have been bent would be by a very hard impact against a dock or piling.

Wagner also noted that the fiberglass around the pinning and gunnel screws was slightly fractured, which Wagner took to show flexing and impact damage to the hull-to-deck joint, as opposed to insufficient screw length or spacing.  Wagner further noticed that the port and starboard air vents over the engines were missing, and that one of the vents had been replaced with a makeshift Plexiglass cover which was broken.  According to Wagner, the only way these vents could have been damaged is by one or more severe impacts with a dock or pilings, and that the vessel had to have been hit on both sides numerous times.

On cross examination, however, Wagner admitted that he did not have much evidence demonstrating the alleged extensive impact damage to the vessel, and that he could not be sure when the damage occurred, or even whether some or all of the damage was caused by the salvage operations, particularly when the vessel was bumping on the bottom of the Gulf of Mexico.[12]  Notably, Wagner did not find any impact damage on the

---

[12]For example, Wagner could not say when the bend in the rub rail's stainless steel insert occurred.  Wagner also testified that a bow rail stanchion on the starboard side was bent, and that it was entirely possible that the salvage operations caused this damage, as well as the other
(continued...)

interior of the vessel, did not measure or otherwise inspect the pinning or gunnel screws, and did not perform any tests on the vessel, other than his walk-through observations on February 3, 2003.  He also admitted that the missing engine vent covers had no bearing on the vessel's sinking.  Finally, Wagner admitted that his conclusion concerning the impact damage was a mere assumption based on the condition of the vessel at the time he inspected it - after it had been salvaged from the Gulf of Mexico - and that he had no other independent evidence that the vessel had ever struck a dock, piling, or other hard object.

The third witness AMH called was John Edward Walker, III, Vice President of Manufacturing for Pro-Line Boats, the company which constructed Schneider's vessel.  In addition to his current position, Walker has more than 25 years experience with all aspects of manufacturing fiberglass hull boats, and in particular the "shoebox" construction design for hull-to-deck joints.

Prior to testifying, Walker reviewed documents detailing the vessel's sales and repair history, Hamlin's expert reports, and Agle's survey report.  Walker also conducted an inspection of the vessel on or about June 17, 2002.  At that time, he walked around the outside of the vessel, looking for any obvious damage or place of water intrusion, and climbed into the vessel, checking for damage to the cabin, bilge and rub rail areas.  Walker

------

[12](...continued)
separations of the hull-to-deck joint.

inspected the vessel a second time a few weeks later.  On that day, Hamlin was also present.

Walker testified that the vessel had no manufacturing defects.  He stated that the hull-to-deck joint was properly constructed, the screws used were of proper size and spacing, and the structure was strong and sound when it left Pro-Line's facilities.   In particular, Walker felt that the gunnel screws were of adequate length because they were able to penetrate both the hull and deck.

Walker also testified that the screws used on the vessel were either one and three-quarter or one and one-half inches in length.  However, Walker made this statement based solely on his manufacturing experience and knowledge of Pro-Line's manufacturing procedures.  He did not actually measure any of the screws from Schneider's vessel and did not produce any of the screws used in the vessel at trial. Regardless, Walker claimed that the length of the screws is largely irrelevant because even a one inch screw would be sufficient to penetrate the hull-to-deck joint, which is only approximately five-eighths of an inch thick.   A longer screw would lend no more holding power.

Walker also reviewed several photographs from Hamlin's report, particularly those showing the gunnel screws ripped loose from the fiberglass hull.[13]  According to Walker, these pictures showed that the screws were number ten screws, were long enough to penetrate the hull, and were pulled away from the hull due to some form of impact.  He also

---

[13]See Plaintiff's Composite Exhibit 50B, photographs 17-19.

reviewed photographs  which portrayed different sections of the aft starboard hull-to-deck joint, and concluded that based on the number of holes in the rub rail in those particular sections, the gunnel screws were approximately six inches apart.[14]

Walker testified that he found a number of "bruises" on the hull where the vessel had bumped up against docks, and found "considerable damage" to the fiberglass hull in the dive platform area in the back corner of the boat.  In addition, Walker observed some rust stains and hard water lines running down from the screws on the inside of the hull-to-deck joint, which Walker took to mean that water had been seeping in through loosened screws on the hull-to-deck joint for some time.[15]   Walker also discussed one of Hamlin's photographs which he believed showed that the gunnel screws in the aft starboard section were bent from a severe impact.[16]

Based on these observations and his review of the photographs from Hamlin's report, as well as his experience in manufacturing hull-to-deck joints for similar Pro-Line boats, Walker concluded that the vessel had been subject to several hard crashes into low docks, where the impact was below the water line and the hull-to-deck joint, and therefore not protected by the rub rail.  Walker testified that such crashes would cause a tremendous amount of flex on the hull side, which eventually would cause the hull and deck to separate.

Walker also testified that the three bilge pumps on the vessel must have

---

[14]Id., photographs 14-15, 23.

[15]Id., photograph 15.

[16]Id., photograph 10.

malfunctioned or were not turned on.  In his opinion, if the automatic float sensors had

been operating properly, they would have triggered the bilge pumps when the water in the

vessel reached six inches deep.  Walker believed that by the time Schneider realized his

vessel was taking on water and manually turned on the bilge pumps, the vessel had too

much water for the bilge pumps to handle, and the vessel sank.[17]

V.      Hamlin's Rebuttal Testimony

At the conclusion of this testimony, ICNA recalled Hamlin, who reiterated that he

measured the pinning screws on Schneider's vessel and found they were only one and

one-quarter inch long, and spaced quite far apart.  Hamlin also emphasized that the gunnel

screws used in the vessel's hull-to-deck joint were only one inch in length and did not fully

penetrate the hull and the deck.  He also confirmed that the screws he measured were in

fact pinning and gunnel screws, not the steel insert screws as Wagner claimed.

Upon review of the photographs taken by Hamlin, there appears to be an unresolved

question as to whether the screws Hamlin measured were in fact the gunnel screws, or the

screws used to attach the steel insert.  Photographs 30-32 from Hamlin's August 13, 2002

---

[17]During his testimony, Walker utilized a demonstrative aid - a model of a hull-to-deck joint similar to the one used in Schneider's vessel.  Although he testified that the model was manufactured with the same materials and dimensions as the hull-to-deck joint in Schneider's vessel, the Court does not find Walker's use of this model persuasive or relevant to the issues in this case.  The model was largely used to describe the design of the hull-to-deck joint, and as previously stated, the design of the joint is not at issue in this case.  Simply put, the only question before the Court is whether AMH followed the design and properly constructed the hull-to-deck joint on Schneider's vessel.  Not only did the model and Walker's testimony concerning the model fail to address that issue, but ICNA presented persuasive testimony from its expert describing the many differences between the construction of Schneider's hull-to-deck joint and the model.

expert report appear to show a one inch long screw that was removed from the steel insert.[18]  Although Hamlin insists that this screw came from the rub rail and not the steel insert, the Court is not entirely convinced, particularly in light of the fact that Hamlin admitted that he never removed the steel insert to look at the rub rail alone. This is a difference without meaning, however, as the Court finds that even if Hamlin measured the wrong screws, he has presented other, convincing evidence establishing that the gunnel screws were either of insufficient length, spaced too far apart, or completely absent from the aft starboard section of the hull-to-deck joint.

In particular, Hamlin pointed to several of his photographs which provided clear views of the separated section of the aft starboard side of the hull-to-deck joint, as well as other nearby sections that later separated.[19]  Three of the photographs showed ten inch sections of the hull-to-deck joint. Each of these sections contained only one pinning screw, and were completely devoid of any gunnel screws.  Another picture showed a 14-15 inch section of the separated hull-to-deck joint, with only one pinning screw penetrating the entire joint, and a complete absence of gunnel screws.  Two other photographs portrayed a 24 inch span of the hull-to-deck joint, containing only three screws that penetrated the deck and hull.[20]   And yet another photograph showed an eight inch section of the

[18]See Plaintiff's Composite Exhibit 50B

[19]See Plaintiff's Composite Exhibit 50A, photographs 10-11, 15.  See also Plaintiff's Composite Exhibit 50B, photographs 21-24, 27, 29.

[20]Hamlin did confirm, however, that the pinning screws, while only one and one-quarter inch (continued...)

separated joint containing only one pinning screw and no gunnel screws.  From these photographs of Schneider's vessel, Hamlin concluded that the pinning screws were placed at intervals much larger than every six inches, and the gunnel screws were either absent, or of such short length, that they did not penetrate the hull or deck and were therefore not visible to the naked eye.[21]

VI.    The Hull-to-Deck Joint Was Improperly Constructed

Having reviewed and weighed all of the evidence presented, including the testimony of ICNA's and AMH's witnesses, the Court concludes that the testimony of Agle, Hamlin and Schneider, and in particular Hamlin's rebuttal testimony,  is persuasive in leading the Court to find that the vessel's hull-to-deck joint was not properly constructed.  Agle conducted a thorough survey of the vessel at the time Schneider purchased it, and found no impact damage or any other structural issues.  In particular, he found the hull-to-deck joint structurally sound.  And Schneider, a witness who has no bias towards either Party, testified that while he occasionally bumped the vessel while docking, he never crashed the vessel into any dock, piling, or other object with any severity during the seven months he owned the vessel prior to its sinking.  Given that Schneider only used the vessel six to ten times before it sank, Schneider would have had to ram the vessel repeatedly into various

---

[20](...continued)
in length, did penetrate both the deck and the hull.  Hamlin's contention is that they were spaced too far apart to be of any effect.

[21]Hamlin also disagreed with Walker's statements that the gunnel and pinning screws were at least one and one-half inches in length, stating that he had never seen any such length screws on the vessel's hull-to-deck joint during any of his inspections.

hard objects in order to achieve the damage AMH claims occurred.  The Court finds this highly unlikely, and completely unsupported.

More importantly, the Court was persuaded by the testimony of Hamlin, who presented photographic evidence demonstrating that the pinning and gunnel screws in the area where the hull-to-deck joint separated were spaced on average approximately nine to ten inches apart, far exceeding accepted industry practices.  Despite the fact that Hamlin did not present convincing evidence that the one inch screws he measured were from the rub rail itself, it is nevertheless clear that the gunnel screws in that particular area of the hull-to-deck joint were either too short to penetrate the entire joint, or completely absent, again violating accepted industry standards, and AMH's own testimony of its construction practices.

AMH's evidence contradicting this point is not persuasive.  AMH's key witness, Walker, relied in large part on a model of a hull-to-deck joint, he did not provide any evidence concerning the spacing of the screws in the particular vessel at issue.  In addition, both of AMH's expert witnesses claimed that the fact that the rub rail contained pre-drilled holes established that AMH actually placed gunnel screws in those holes.  The Court does not believe it does.  Rather, these pre-drilled holes merely prove the number of holes available on the rub rail, they do not prove that any gunnel screws were ever inserted into these holes, or that the gunnel screws were of sufficient length. Notably, none of the witnesses called by AMH ever measured any of the screws that were used in Schneider's vessel.  Rather, they relied again on examples of similar screws from AMH's warehouse,

which conflicted with the irrefutable photographic evidence from Hamlin's expert report. Given the weight of the evidence presented, the Court concludes that the hull-to-deck joint on Schneider's vessel was negligently constructed.

VII.   Causation

Based on these findings, the Court further finds that the vessel sank due to the faulty construction of the hull-to-deck joint.   The testimony presented by ICNA persuasively demonstrates that the pinning and gunnel screws were spaced too far apart, and that the gunnel screws were not long enough to penetrate the entire hull-to-deck joint.   These manufacturing defects created stress on the hull-to-deck joint, which over time caused the joint to separate and permit the incursion of water into the vessel.

The Court does not find the evidence from AMH's witnesses to be persuasive as to the cause of the vessel's sinking.   None of AMH's witnesses could speak with any precision as to when or how the alleged impact damage occurred, and more importantly, could not rule out that the impact damage occurred during the salvage operations.   For example, Walker testified that he had no idea when the damage to the transom area of the vessel could have occurred, and even admitted that some of the damage, such as the missing engine vents, would not have caused the vessel to sink.   AMH's evidence was also directly contradicted by both Agle and Schneider, who testified that there was no impact damage at the time Schneider purchased the vessel, and that Schneider did not crash the vessel into any docks or pilings.

In addition, AMH did not otherwise support its contention that impact damage caused the sinking with any scientific tests or statistical evidence.  AMH did not engage the services of a professional engineer to inspect and test the structure of the vessel's hull to verify the extent of the damage, despite having access to an entire engineering department.  Nor did AMH provide any clear photographic evidence detailing the alleged damage to the vessel. AMH did not even present any testimony from the prior owners of the vessel, the only other potential persons who could have caused any impact damage to the vessel.  Thus, the only support for AMH's position concerning the cause of the vessel's sinking are its witnesses' suppositions.[22]

The Court further finds that AMH has not presented persuasive evidence demonstrating that the vessel sank due to a malfunction with the bilge pumps.   Walker gave his opinion that the bilge pumps "must have" malfunctioned because they would have turned on automatically by the time the vessel filled with six inches of water.  However, AMH did not provide any evidence indicating how much water was in the boat when Schneider manually turned the pumps on, other than Walker's own supposition.  Thus it is unknown whether Schneider manually turned them on before the water level in the boat rose to six inches.

---

[22]The Court further discounts AMH's claims that the vessel suffered severe impact damage because Kaestner, the sales manager at Salty Sam's Marina, testified that while he observed some scratches and deck rash, but that such damage was common.  Kaestner also testified that the vessel was in good condition, and he had no concerns selling it to Schneider.  Surely if the vessel had suffered severe impact damage, which was easily observable by AMH's expert witnesses, Kaestner would have also seen it and refused to sell the vessel until it was repaired.

It is equally unclear whether the bilge pumps' automatic float switches were inoperable.  The only witness who could testify to that point, Schneider, could not state whether the switches were on or not at the time the vessel sank.  However, he did testify that he had requested that Salty Sam's Marina repair the aft bilge pump as a condition of sale, and that he believe that work was completed prior to June 15, 2002.  Schneider also testified that once he manually turned the bilge pumps on, which was before the back of the boat or the transom were underwater, that the pumps were working.  Given these conflicting facts, and weighing the evidence and credibility of the witnesses, the Court finds that AMH has not presented sufficient evidence to establish that the bilge pumps were not working as intended.  Instead, it is more likely that the volume of water which came onto the vessel simply outpaced the bilge pumps' capacity.  Thus, the Court rejects AMH's argument that a failure of the bilge pumps was the proximate or superseding intervening cause of the vessels' sinking.

The Court therefore finds that the vessel sank due to the separation of the hull-to-deck joint, which was caused by AMH's negligent failure to insert pinning and gunnel screws at intervals of six inches, and AMH's negligent failure to utilize gunnel screws that were of sufficient length to penetrate both the hull and deck.

## **CONCLUSIONS OF LAW**

The Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1367 and 1331(1).  ICNA's product liability tort claims of negligence and strict liability are recognized under

general maritime law. East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858

(1986).  Neither party disputes that Florida law applies to these claims.  The Court also

concludes that ICNA, as the insurer of the vessel in question, is subrogated to the rights of

its insured, and that Schneider has satisfied all terms and conditions of his marine policy of

insurance.  The Parties do not dispute ICNA's right to bring this action.

I.    ICNA's Motions in Limine

ICNA previously filed a motion to strike (Doc. 57) the expert witness testimony of

Randolph Wagner on the grounds that the methodology he used to reach his conclusions

was not sufficiently reliable under Federal Rule of Evidence 702 and Daubert v. Merrel Dow

Pharmaceuticals, 509 U.S. 579 (1993).  ICNA orally moved at trial to strike the expert

testimony of John Walker for the same reasons.  The Court concludes that both motions are

due to be denied.

The admissibility of expert testimony is governed by Rule 702, which provides that

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact
> in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form
> of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Fed.R.Civ.P. 702.  In Daubert and  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137

(1999), the United States Supreme Court made clear that "Rule 702 compels the district

courts to perform the critical 'gatekeeping' function concerning the admissibility of expert

scientific [technical and other specialized] evidence." United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004), cert. denied, 544 U.S. 1063 (2005). "The objective . . . is to ensure the reliability and relevance of [the] expert testimony." Kumho, 526 U.S. at 152.

Thus, to determine the admissibility of expert testimony, the Court must consider if: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." Frazier, 387 F.3d at 1260. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). In this case, there is no dispute as to the qualifications of Wagner or Walker or that their testimony is relevant. ICNA, however, argues that AMH failed to establish the reliability of their expert opinions.

To assess the reliability of an expert opinion, the Court considers a number of factors, including those "indicia of reliability" listed by the Supreme Court in Daubert:  (1) whether the expert's theory  can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique, and (4) whether the technique is generally accepted in the field. Frazier, 387 F.3d at 1262; see also United States v. Brown, 415 F.3d 1257, 1266-67

(11th Cir. 2005) (citing Daubert, 509 U.S. at 593-94).  These factors are only illustrative and may not all apply in every case.  Frazier, 387 F.3d at 1262.  The Court has wide latitude in deciding how to determine reliability.  Kumho, 526 U.S. at 142.

ICNA contends that Wagner and Walker's testimony is akin to "scientific knowledge" and is not reliable under any of the factors set forth in Daubert.  According to ICNA, Wagner and Walker simply based their opinions on their own supposition and speculation, without any verifiable facts to support them.

The Court disagrees.  First, there is no evidence that Wagner or Walker ever presented themselves as scientific experts.  Instead, Wagner and Walker based their testimony on their knowledge, training and experience in the area of manufacturing of recreational vessels - i.e. "other specialized knowledge."  And there can be no dispute that both Wagner and Walker have extensive knowledge, training, and experience in that area - they have each conducted hundreds of boat surveys, and Walker has personally overseen the construction of thousands of recreational vessels.

The Court further concludes that the indicia of reliability described in Daubert are not pertinent in this case and that the testimony of Wagner and Walker, while not entirely persuasive, is sufficiently reliable to be considered.  Both of AMH's experts testified based on their own first-hand observations of the vessel after it was salvaged.  They formed conclusions as to the cause of its sinking using their vast wealth of knowledge and experience in the recreation boating industry, including industry standards on the spacing and size of pinning and gunnel screws, as well as their review of several photographs taken

27

from the vessel.  This is the same methodology used by ICNA's own expert, Hamlin, and

no one has challenged the admissibility of his testimony.  The only fact that differentiates

Hamlin's testimony is his additional step of measuring the pinning and gunnel screws.  This

is not sufficient to establish that AMH's experts' testimony is completely unreliable.

Accordingly, the Court will deny ICNA's motions in limine.[23]

II.    ICNA's Negligence and Strict Liability Claims

    ICNA's remaining claims in this lawsuit are state law claims for negligence and strict

liability centering on AMH's improper construction of the vessel's hull-to-deck joint.   Under

Florida law, to prevail on a negligence claim, a plaintiff must establish by a preponderance

of the evidence that:  (1) the defendant owes a legal duty to the plaintiff; (2) the defendant

breached that duty; (3) the defendant's breach legally caused an injury to the plaintiff; and

(4) damages resulted from the injury.  Pinchinat v. Graco Children's Prods., 390 F. Supp.2d

1141 (M.D. Fla. 2005).

    A claim for strict liability in Florida shares many of the same elements of a negligence

claim, but without the requirement of establishing either a legal duty or breach of that duty.

More specifically, a plaintiff most prove by a preponderance of the evidence that: (1) a

product; (2) produced by a manufacturer; (3) was defective or created an unreasonably

dangerous condition; (4) that proximately caused; (5) an injury.  Benitez v. Synthes, Inc.,

---

[23]The Court could also deny these motions as moot, given that the testimony of AMH's experts is not persuasive.

28

199 F.Supp.2d 1339 (M.D. Fla. 2002) (citing <u>Edward M. Chadbourne, Inc. v. Vaughn</u>, 491 So.2d 551 (Fla. 1986)).

Where a product fails, malfunctions, or as here, separates, during normal operation, the plaintiff is entitled to a legal inference that the product was defective at the time it was within the control of the manufacturer or retailer, at the time the product was sold, and at the time of injury.  <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253 (11th Cir. 2002) (citing <u>Cassisi v. Maytag Co.</u>, 396 So.2d 1140, 1148 (Fla. 1st Dist Ct. App. 1981)); <u>Diversified Products Corp. v. Faxon</u>, 514 So.2d 1161 (Fla. 1st Dist. Ct. App. 1987).  In a strict liability action, however, the factor of control, insofar as it relates to the time elapsed from the sale to injury, is but one of several circumstances to be considered in determining whether the product was defective while it was within the control of the manufacturer or distributor.  <u>Cassis v. Maytag Co.</u>, 396 So.2d 1140, 1152 (Fla. 1st Dist. Ct. App. 1981).  Other circumstances include the product's age, the length of the products' use, the severity of its use, the state of its repair, its expected useful life, and whether it was subject to any abnormal operations.  <u>Id.</u>  In addition, the principle of pure comparative fault applies to both ICNA's negligence and strict liability claims.  <u>McDermott, Inc. v. AmClyde</u>, 511 U.S. 202 (1994); <u>Lewis v. Timco, Inc.</u>, 716 F.2d 1425 (5th Cir. 1983).

The Court concludes, and neither party disputes, that AMH, through its subsidiary Pro-Line, was the manufacturer of the "product" at issue - the vessel - and that as the manufacturer, AMH owed a legal duty to ICNA to construct the vessel in accordance with its design and free from any defects.  The Court further concludes, again without any

29

dispute, that ICNA, as Schneider's subrogee, suffered damages in the amount of its marine insurance policy, which arose when the vessel and all of Schneider's property housed on the vessel, sank in the Gulf of Mexico.

Turning now to the disputed issues, the Court concludes that AMH breached its legal duty to ICNA when it manufactured the vessel's hull-to-deck joint in a negligent manner. In particular, the Court concludes that AMH was negligent when it did not insert the pinning and gunnel screws into the hull-to-deck joint at six inch intervals, and used only one inch gunnel screws.  The improperly spaced and sized screws also constitute manufacturing defects, which rendered the vessel in a defective and/or unreasonably dangerous condition.

The question then becomes whether the evidence preponderates to show that AMH's negligence and manufacturing defects caused the separation of the hull and deck on the aft starboard side or, as AMH contends, the separation occurred because of impact damage to the gunnel, and faulty bilge pumps, rather than negligent construction.  Weighing the evidence presented during trial, the Court concludes that the evidence preponderates in favor of ICNA – that is, the Court concludes that ICNA has met its burden of proof and demonstrated through a preponderance of the evidence that the separation of the hull and the deck on the aft starboard side was due to the improper size and spacing of the screws.

The Court further concludes from a preponderance of the evidence that the improper size and spacing of the screws in the hull-to-deck joint were the proximate cause of the vessel's sinking.  The screws did not operate to secure the hull-to-deck joint, but rather

created a force pushing the hull and deck apart, which ultimately resulted in a separation of the joint, permitting water to flood the vessel.

The Court also concludes that AMH has not proven by a preponderance of the evidence that the vessel sank either because Schneider or some other unknown person(s) repeatedly crashed the vessel into docks or pilings, or caused any other severe impacts to the vessel.  In particular, the vessel was only five years old at the time it sank, and there was no persuasive evidence of severe or abnormal use.  The only evidence of any weight merely established that the vessel was subject to normal use, and kept in good condition. Similarly, the Court concludes that the evidence does not preponderate in favor of AMH's contention that the vessel sank because the bilge pumps were not operational.  As such, the Court concludes that Schneider was not comparatively negligent, and did not exhibit a lack of ordinary due care in his operation of the vessel.

Having determined that ICNA has established a *prima facie* case of both negligence and strict liability, and that AMH has failed to refute ICNA's claims, the Court concludes that ICNA is entitled to judgment on both claims.  The amount of damages is $109,750, the limits of the marine insurance policy, less a set-off for the hull salvage sale proceeds in the amount of $26,204,80.  The Court further concludes that ICNA is entitled to pre-judgment interest from the date payment was made to its insured, Todd Schneider, pursuant to the terms of their marine insurance contract.  See City of Milwaukee v. Cement Division, National Gypsum Co., et al., 515 U.S. 189 (1995).

## CONCLUSION

The Court finds and awards damages to the Plaintiff, Insurance Company of North America, and against the Defendant, American Marine Holdings, Inc. in the amount of $83,545.20, plus pre-judgment interest at the rate prescribed by law from the date payment was made to the insured, Todd Schneider, to the date of this Order, and costs as permitted by law.  ICNA's Motion in Limine (Doc. 57) and oral Motion in Limine at trial are DENIED. The Clerk is directed to enter judgment accordingly, terminate any pending motions and close the file.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 7th day of September, 2006.

_____
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record